LOBRANO, Judge.
This appeal arises from a judgment in favor of defendant-appellee, Pelican Homestead and Savings Association and its worker’s compensation insurer, Fidelity and Deposit Company of Maryland, (Fidelity) and against plaintiff-appellant, Glenn Trahan dismissing Trahan’s claim for additional temporary total disability worker’s compensation and other medical benefits for injuries Trahan allegedly sustained during the course and scope of his employment with Pelican.
FACTS:
On February 8, 1989, Trahan and his coworker, Richard Williams, were moving eight (8) refrigerators into various apartments in a three (3) story apartment complex owned by Pelican when he was injured.
Moving the refrigerators consisted of pushing and pulling each refrigerator up a flight of approximately fifty (50) steps to the appropriate floor. Trahan assumed the pushing position below each refrigerator while Williams assumed the pulling position above. During the process of moving the fifth or sixth refrigerator, Williams missed a step causing the weight of the appliance to bear down on Trahan’s arms, hands and shoulders. In an attempt not to lose the refrigerator down the stairwell, Trahan pushed up on the unit with all his strength. As a result, a pain shot into his neck and shoulder area causing numbness in his right arm and hand for approximately five (5) minutes. Williams immediately transported Trahan to the office of Dr. Bryan Bertucci, Trahan’s family physician. Dr. Bertucci examined Trahan and placed him on “no duty” status. Dr. Bertucci diagnosed Trahan as having sustained cervical strain, right upper trapezius strain and thoracic strain.
*787 Trahan continued to receive conservative treatment until referred by Dr. Bertucci to Dr. F. Daniel Seltzer, an orthopedic surgeon, who was subsequently approved by Fidelity to be Trahan’s treating physician. Dr. Seltzer examined Trahan on March 3, 1989 for orthopedic evaluation and treatment. Dr. Seltzer found no objective findings to support the severity of Trahan’s continued complaints, no long term disability and no reason for surgical intervention of either the cervical or lumbar areas.
Thereafter, Fidelity suspended all treatment of Trahan. As a private patient, Tra-han then sought treatment with Dr. Henry LaRocca, an orthopedic surgeon on April 24, 1989. Dr. LaRocca continued to treat Trahan through the date of trial. During this interim, Fidelity reinstated Dr. Seltzer as Trahan’s treating physician and also referred him to orthopedic surgeon, Dr. Claude Williams.
Fidelity refused to pay for any medical services or expenses performed by or related to treatment provided by Dr. LaRocca. As a result, Trahan filed a claim with the Office of Worker’s Compensation. Trahan continued to receive temporary total disability benefits up to the date of trial.
Trahan’s claim for the medical benefits in question as well as additional compensation benefits was heard by the Office of Worker’s Compensation on October 8,1990. The administrative hearing officer rendered judgment in favor of Pelican and Fidelity dismissing Trahan’s claims.
Trahan appeals the judgment of the Office of Worker’s Compensation asserting:
1) The trial court erred in not authorizing the continued treatment of Trahan’s cervical condition.
2) The trial court erred in not authorizing the continued treatment of Trahan’s lumbar condition.
3) The trial court erred in not authorizing the continued treatment of Trahan’s carpal tunnel syndrome.
4) The trial court erred in not finding Trahan temporarily totally disabled in the absence of any medical testimony that Trahan could return to work.
5) The trial court erred in not finding Trahan was entitled to supplemental employment benefits pursuant to Louisiana Revised Statute 23:1221(3).
6) The trial court erred in not ordering defendants to pay the additional medical bills of Dr. Henry LaRocca, Dr. Daniel Trahant, the Radiology Consultants of New Orleans, New Orleans Radiology Group and other unpaid prescription charges.
7) The trial court erred in not awarding Trahan $267.00 in back compensation for the initial week of disability.
MEDICAL TESTIMONY ADDUCED AT THE HEARING:
DR. BRYAN BERTUCCI:
Dr. Bertucci testified that he had treated Trahan for various neck injuries in November, 1983, February, 1984, October, 1985, July, 1988 and August, 1988. Dr. Bertucci testified that in November, 1983, Trahan was placed on light duty work status because of neck problems. In addition, Tra-han sustained acute cervical strain and severe spasm in February, 1984 and May, 1984, respectively.
After August, 1988, the next time Dr. Bertucci saw Trahan was on February 8, 1989, the day of the accident. The physical examination showed tenderness in the upper trapezius and cervical spine area at the C-3 through C-7 levels. Trahan did not complain of lumbar pain at this time. Instead, his complaints were limited to cervical spine, upper trapezius and thoracic spine, T-2 thru T-6. The only objective sign of injury that Dr. Bertucci found on February 8, 1989 was muscle spasm in the right upper trapezius muscle.
Dr. Bertucci continued to treat Trahan conservatively and ordered that an MRI and EMG be conducted. On March 14, 1989, the MRI showed degenerative disc disease at the C4/C5 and C5/C6 levels with right lateral spinal stenosis at the C-5/C-6 level. No impingement of the spinal cord was detected. In addition, there were marginal osteophyte formations at the same levels which Dr. Bertucci stated suggests *788 arthritic type changes. The results of the EMG were normal.
Dr. Bertucci testified that a normal recovery period for an injury of the type suffered by Trahan is anywhere from six (6) weeks to three (3) months. However, Dr. Bertucci stated that Trahan’s cervical osteoarthritis could affect the length of his recovery.
In addition, Dr. Bertucci noted that several intervening aggravating incidents would also affect the length of rehabilitation. These incidents included a burn to his arm, back strain caused when he stepped into a hole while walking to church and a neck injury sustained while serving as a pallbearer.
Dr. Bertucci’s final diagnosis of March 21, 1989 was cervical strain, right upper trapezius strain with spasm, degenerative disc disease with right lateral spinal steno-sis and thoracic strain. There was no diagnosis of carpal tunnel syndrome.
Since Trahan continued to complain beyond the expected period of recovery Dr. Bertucci referred Trahan to Dr. F. Daniel Seltzer in March, 1989, for a possible mye-logram to evidence any undiscovered problems.
Dr. Bertucci testified that as of his last visit with Trahan on March 21, 1989, there were no restrictions or limitations to the lumbar spine as “the lumbar spine area was not a significant problem”. Dr. Ber-tucci found no reason to perform a thoracic or lumbar MRI.
Dr. Bertucci last treated Trahan in June, 1990 when he injured his toes while mowing the lawn.
DR. F. DANIEL SELTZER:[1]
Dr. F. Daniel Seltzer, an orthopedic surgeon, first treated Trahan in March, 1983 following an automobile accident. Trahan complained of back and neck pain with occasional headaches. X-rays were taken. No evidence of injury was found. However, the x-rays did show Trahan was born with the congenital defect called spina bifi-da occutta, an opening at the base of the spine, which Dr. Seltzer stated had no relationship to Trahan’s complaints of pain at that time.
Dr. Seltzer diagnosed Trahan as suffering with cervical and lumbar strain. He treated him conservatively through June, 1983.
Dr. Seltzer next saw Trahan on March 23, 1989 via a referral from Dr. Bertucci. The area of complaint was limited to Tra-han’s neck. He did not indicate he had pain in his lower back. A physical examination revealed a mild decreased range of motion in the cervical spine and mild muscular tenderness. Dr. Seltzer found no objective signs of injury. His findings were based solely on Trahan’s subjective responses. No spasm was noted in the neck or back.
Dr. Seltzer next saw Trahan on August 31,1989. At that time he performed another physical examination. Again, he found no objective signs of injury and no indication that any surgery was warranted. In addition, he reviewed the MRI scans previously performed and the diagnostic studies ordered by Dr. Henry LaRocca. He found the MRI within normal limits with some degenerative disc disease at the C-4/C-5 and C-5/C-6 levels and a posterior bulge of the disc at the C-5/C-6 and C-6/C-7 levels. Dr. Seltzer stated this bulge was not clinically significant as there was no herniation and no necessity for surgery. The diagnostic studies ordered by Dr. LaRocca did not change his diagnosis that Trahan sustained a soft tissue strain of the cervical and lumbar spine, a condition which usually resolves over a period of weeks to months with six months as the upper limit.
He testified that no further tests were warranted. “I am not sure I can think of any additional testing which would yield any other information which would be more valuable than the testing which we have and I think of no way that the testing is incomplete at this point.” He stated that he could find no objective reason for Tra-han’s persistent complaints of severe pain in the cervical and lumbar areas.
*789 Dr. Seltzer testified that at no time did Trahan complain of numbness in his wrists or arms. Dr. Seltzer vehemently denied any connection between the February 8, 1989 accident and carpal tunnel syndrome. He stated that while the nerve conduction test of September 12, 1989 was positive for bilateral carpal tunnel syndrome, it was not positive in regard to the cervical/lumbar spine. As to the cause of the carpal tunnel syndrome, Dr. Seltzer testified as follows:
“Carpal tunnel syndromes are very difficult to arrive at causation. However, it would appear that it is more likely than not that if it does have any specific causation that that causation would have hurt sometime in between March, 1989 when the first study was negative and September, 1989 when the second study was positive. It is conceivable that he could have had some form of injury or some incident which could have occurred between March, 1989 and September, 1989. It is also possible that it could have developed in and of itself between March, 1989 and September, 1989.
In many cases, there is no reason for the development of carpal tunnel syndrome and, in fact, statistically, carpal tunnel syndrome probably cannot be placed as a result of any one specific instance in the majority of cases.
Given the fact that the EMG was done or EMG and nerve conduction study was done approximately five weeks or more following the incident of February 8, 1989, it will be difficult for me to concede that the carpal tunnel syndrome would be directly related to an incident in February, 1989.
$ * * * ⅜!
There is no connection between the findings of the cervical spine and the carpal tunnel syndrome. Carpal tunnel syndrome is purely simply a condition that is manifest at the wrist. It has nothing to do whatsoever with changes in the cervical spine.”
In refuting Dr. LaRocca’s findings, Dr. Seltzer stated:
“Q. Doctor, with regards to the carpal tunnel syndrome, isn’t it usual ... that people who suffer from a cervical problem or have a cervical disc problem that they develop carpal tunnel syndrome?
A. That’s absolutely not true.
Q. If that nerve is being aggravated at that C5 and 6 level, could it cause it to become irritated down the line and thereby swelling and causing the carpal tunnel syndrome?
A. Absolutely not.
Q. If Dr. LaRocca has testified that that can be the case, then you would just flat out disagree with him?
A. Absolutely. I respect Dr. LaRocca, but if he has said that, I believe he is wrong, and I think that most orthopedic surgeons would believe that that statement is incorrect as well.
[[Image here]]
Q. ... if Mr. Trahan had never had any problems with radicular pain into his arms or any other numbness in hands or any other symptomatology that may show a carpal tunnel or some type of disc problem in the neck, would it be more likely than not that it would have been caused by the trauma in February?
A. I don’t see any basis upon the trauma in February having caused any specific problems. Again, he has had two negative EMGS and there is no indication that he has any form of radicular injury on two successive EMGS. Beyond that, there is nothing in specific which I can say is directly attributable objectively to the incident which he alleged happened in February, 1989.”
In discussing the lumbar strain, Dr. Seltzer stated that Trahan suffers with minor degenerative changes at the L-4/L-5 facet joints. However, Dr. Seltzer testified that this condition is compatible with an individual past the age of 30 who is engaged in manual labor. He also testified that there is no surgical procedure to relieve facet arthritic or facet degenerative changes. DR. HENRY LaROCCA:[2]
Dr. Henry LaRocca, an orthopedic surgeon, first saw Trahan on April 24, 1989. *790 Dr. LaRocca testified that Trahan came to him as a private patient. He admitted that he knew Trahan’s injuries were work related and that there was a possibility of litigation. He stated he did not seek permission from Trahan’s employer or compensation carrier to treat Trahan.
Dr. LaRocca testified that Trahan did not inform him of previous neck injuries but did tell him he had a previous back injury. He admitted that knowledge of prior injuries is important in establishing causation.
Following a series of tests, Dr. La-Rocca’s final diagnosis was lumbar and cervical strain and spondylosis, a degenerative disc disorder compatible with individuals engaged in manual labor. He determined Trahan’s neck pain to be due to spondylosis at the C-5/C-6 and C-6/C-7 levels. He found no nerve root impingement or compression. Dr. LaRocca recommended surgery to remove the C-5 disc along with fusing the levels above and below to avoid future surgery in those areas as they show degenerative disease as well. Dr. LaRocca’s diagnosis was based on the results of the CAT scan, discography and electrical measurements. He admitted, however, that the EMGS of the upper and lower extremities were normal.
Dr. LaRocca was the only physician who opined that Trahan’s carpal tunnel syndrome was related to the February 8, 1989 accident. His findings were based on the fact that the carpal tunnel syndrome is the entrapment of the median nerve as it enters the wrist and hand due to compression of the ligament which overlies the nerve. The median nerve exits the spine at the C-5/C-6 level. This is the level of Trahan’s stenosis. Thus, Dr. LaRocca concluded Trahan suffers from what he termed the “double jeopardy syndrome” — carpal tunnel syndrome in conjunction with neck disease. Dr. LaRocca opined that since Tra-han complained of numbness in his hand immediately after the accident which continued to the present, then the carpal tunnel syndrome is related to the accident.
Dr. LaRocca diagnosed the cause of Tra-han’s lumbar pain as abnormal joint orientation at the L-4/L-5 level and joint overgrowth at the L-5 level along with a defect in the ring circling the spinal canal at L-5. This condition is known as facet joint disease and tropism. He related the permanent onset of Trahan’s lumbar symptomolo-gy to the February 8, 1989 accident based on the subjective history given by Trahan. He recommended fusion in the lumbar area if the pain persisted.
DR. CLAUDE E. WILLIAMS:[3]
Dr. Williams, an orthopedic surgeon, first saw Trahan on June 29, 1989 at the request of Fidelity. Following a physical examination, Dr. Williams found no objective signs of injury in the cervical spine. He did note subjective complaints of pain in the lumbar area. Radiographic studies showed no fractures or dislocations of the cervical or lumbar areas. Trahan did not complain of any pain in his writs or arms.
Dr. Williams also reviewed the cervical MRI performed in March, 1989. He testified that the results showed some degenerative disc problems which were compatible with Trahan’s age and work history. The results showed no degenerative disc problems warranting surgery. Because of Tra-han’s complaints of pain, Dr. Williams recommended a lumbar MRI which was performed in July, 1989. The results revealed no disc problems.
Dr. Williams again saw Trahan on September 10, 1989 at Fidelity’s request. Again, a physical examination revealed no objective sign of injury. Trahan did not complain of wrist or arm pain. Trahan did, however, complain of pain in the back. Some subjective restriction of motion was noted.
Dr. Williams also reviewed the tests performed by Dr. LaRocca. He indicated no sign of nerve root compression or impingement. There were mild degenerative changes at the C-5/C-6 level. Dr. Williams noted no herniated discs warranting surgery. He noted small osteophyte in Trahan’s neck at the C-5/C-6 level which were degenerative changes compatible with Trahan’s age. He felt Trahan was able to *791 perform moderate work activities. He assigned an impairment rating of approximately 5% to the cervical spine. He stated, “I would not recommend this man have surgery for the degree of degenerative change.”
After review of Trahan’s discogram, which Dr. Williams admitted is a controversial test, Dr. Williams noted congenital facet joint disease and tropism. He stated this condition is not caused by trauma. He assigned no disability rating to the lumbar spine and felt Trahan could return to full work activities.
ASSIGNMENTS OF ERROR 1, 2, 3 AND 4:
Louisiana Revised Statute 23:1221(1) provides:
“(1) Temporary total.
(a) For any injury producing temporary total disability of an employee to engage in any self-employment or occupation for wages, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured, and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
(b) For purposes of Subparagraph (l)(a) of this Paragraph, compensation for temporary disability shall not be awarded if the employee is engaged in any employment or self-employment regardless of the nature or character of the employment or self-employment including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain.
(c) For purposes of Subparagraph (l)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (l)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
(d)An award of benefits based on temporary total disability shall cease when the physical condition of the employee has resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee may be made, and the employee’s physical condition has improved to the point that continued, regular treatment by a physician is not required, or six months after the injury, whichever first occurs. If the claimant contends that his disability is of a temporary nature, but extends beyond this six-month period, he must submit a claim for extension of the period of temporary total disability under R.S. 23:1310.3.”
In Sharpless v. Jo Ellen Smith Medical Center, 557 So.2d 287 (La.App. 4th Cir.1990), writ den. 558 So.2d 606 (La.1990), this court succinctly stated:
“In order to receive temporary total disability benefits, the claimant must prove that the injury has prevented her from engaging in any self-employment or gainful occupation, regardless of whether that was of the same type in which the employee was engaged at the time the injury was sustained, (citation omitted) This court recognizes the rule that in compensation cases the law is to be liberally construed in favor of the employee. However, a plaintiff seeking temporary total disability is required to prove the facts by a preponderance of the evidence and with the same legal certainty as required in any other civil case, (citation omitted)
Whether a plaintiff’s pain is substantial enough to render her disabled in a question of fact. Such a determination of fact will not be disturbed on appeal when *792 there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for such finding, unless such findings are clearly wrong.” (citation omitted) at pps. 288, 289.
Four physicians testified in the instant case. Of these, only Dr. LaRocca found a causal connection between Tra-han’s continued complaints of severe pain and discomfort and the February 8, 1989 accident. Dr. LaRocca’s opinion was based on Trahan’s subjective complaints, the medical history provided by Trahan and the results of the diseogram which showed Tra-han suffered with a degenerative disc prolapse. Dr. LaRocca admitted, however, that Trahan did not inform him that he had suffered cervical problems prior to the accident. Dr. LaRocca stated that if Trahan was experiencing cervical and lumbar pain before the accident that it is “likely”, given Trahan’s degenerative condition, that the cause of Trahan’s continued symptomatolo-gy pre-dated the February 8, 1989 accident. The disc prolapse upon which Dr. LaRocca based his recommendation for surgical intervention was considered clinically insignificant by Drs. Seltzer and Williams.
Drs. Bertucci, Seltzer and Williams could find no objective evidence of injury. It was their opinion that Trahan suffered cervical and lumbar strain, a condition that resolves over a period of weeks to months, with six months as the upper limit. All of the physicians agreed that Trahan could return to gainful employment.
Thus, given the record before us we find no error in the hearing officers conclusion that Trahan failed to carry his burden of proof. Trahan is no longer entitled to temporary total disability benefits.
These assignments of error are without merit.
ASSIGNMENT OF ERROR 5:
Louisiana Revised Statute 23:1221(3) provides:
“(3) Supplemental earnings benefits.
(a) For injury resulting in the employee’s inability to earn wages equal to ninety per cent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed as four and three-tenths times the wages as defined in R.S. 23:1021(10).”
A claimant is not entitled to supplemental earnings benefits unless he can show that the work related injury resulted in his inability to earn wages equal to ninety (90%) percent or more of his wages at the time of the injury. Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989).
A claimant is not entitled to supplemental earnings benefits when his inability to earn wages equal to ninety (90%) percent of his pre-injury wages is due to circumstances other than the work related injury. Killen v. Continental Ins. Co., 514 So.2d 711 (La.App. 2nd Cir.1987).
Once the plaintiff has met his initial burden of entitlement to supplemental earnings benefits, the burden then shifts to the employer to prove that employment is available to the claimant. Daigle v. Sherwin-Williams Co., supra.
We conclude that the plaintiff has failed to meet his initial burden. In our opinion the medical evidence clearly supports the finding that any problems Trahan may have been experiencing at the time of trial were not related to the accident of February 8, 1989. For that reason we hold he is not entitled to supplemental earnings benefits.
*793 ASSIGNMENT OF ERROR 6:
Trahan asserts it was error not to order the payment of the following medical bills associated with the treatment ordered and provided by Dr. LaRocca.
1) $587.00 owed to Radiology Consultants of New Orleans for tests performed July 27, 1990;
2) $730.00 owed to Dr. Daniel Trahant for tests performed on September 12, 1989; and
3) $600.00 owed to Dr. LaRocca for services rendered.
In addition Trahan requests that defendant be ordered to pay all prescription charges pursuant to treatment by Dr. La-Rocca and $150.00 owed to the New Orleans Radiology Group for the MRI performed March 14, 1989.
Louisiana Revised Statutes 23:1121(B) & (C), 1142(B) and 1203 provide as follows:

Section 1121(B) & (C):

“B. The employee shall have the right to select one treating physician in any field or specialty. After his initial choice the employee shall obtain prior consent from the employer or his worker’s compensation carrier for a change of treating physician within that same field or specialty. The employee, however, is not required to obtain approval for change to a treating physician in another field or specialty.
C. If the employer or insurer has not consented to the employee’s request to change physicians when such consent is required by this Section, and it is determined by a court having jurisdiction that the withholding of such consent was arbitrary and capricious, or without probable cause, the employer or the insurer shall be liable to the employee for reasonable attorney’s fees related to this dispute and for any medical expense so incurred by him for an aggravation of the employee’s condition resulting from the withholding of such physician’s services.”

Section 11J)2(B):

“B. Nonemergency care. Except as provided herein, each health care provider may not incur more than a total of seven hundred fifty dollars in nonemer-gency diagnostic testing or treatment without the mutual consent of the payor and the employee. Except as provided herein, that portion of the fees for non-emergency services of each health care provider in excess of seven hundred fifty dollars shall not be an enforceable obligation against the employee or the employer or the employer’s worker’s compensation insurer unless the employee and the payor have agreed upon the diagnostic testing or treatment by the health care provider.

Section 1203(A):

“A. In every case coming under the Chapter, the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment and any nonmedical treatment recognized by the laws of this state as legal, and shall utilize such state, federal, public, or private facilities as will provide the injured employee with such necessary services. All such care, services, and treatment shall be performed at facilities within the state when available. The obligation of the employer to furnish such care, services, treatment, drugs, and supplies, is limited to the reimbursement determined to be the mean of the usual and customary charges for such care, services, treatment, drugs, and supplies, as determined under the reimbursement schedule annually published pursuant to R.S. 23:1034.2 or the actual charge made for the service, whichever is less.”
Defendants argue that because Trahan sought unauthorized treatment with Dr. LaRocca, he was in effect “doctor shopping” and therefore, defendant’s refusal to pay for the services and treatment was justified and not arbitrary and capricious.
The record reflects that Dr. Bertucci referred Trahan to Dr. Seltzer who saw Tra-han twice. The first visit was on March 23, 1989. Sometime after this date, defendants suspended treatment to Trahan. Trahan then sought treatment on April 24, 1989 with Dr. LaRocca. Trahan and Dr. LaRocca admitted that Trahan came to Dr. LaRocca as a private patient and that no authorization was sought by either from *794 defendants. However, the record also reflects that Trahan continued to receive compensation benefits from defendant throughout the period of treatment by Dr. LaRocca up to the day of trial. In addition, defendants paid for the testing performed at Elmwood Medical Center ordered by Dr. LaRocca and subsequently reauthorized Dr. Seltzer to again begin treatment of Trahan. Dr. Seltzer, at defendant’s request, examined Trahan a second time on August 31, 1989. Trahan, however, continued treatment with Dr. LaRocca.
Based on the facts and circumstances of this case, it is reasonable to conclude that Dr. LaRocca was Trahan’s first choice orthopedic surgeon and treating physician. Given that conclusion, no prior consent or authorization was necessary and defendants were responsible for the medical treatment. We note, however, that this fact alone does not mandate that Dr. LaRocea’s opinion as to Trahan’s work related injury be given any more weight than that of Drs. Bertucci, Seltzer and Williams. See, Vicknair v. Southern Farm Bureau Casualty Insurance Company, 292 So.2d 747 (La.App. 4th Cir.1974), writ den., 296 So.2d 888 (La.1974).
All medical expenses associated with the treatment provided by Dr. La-Rocca are owed by defendants. The same additional testing performed by Dr. La-Rocca was also recommended by Dr. Seltzer. The MRI of March 14, 1989 ordered by Dr. Bertucci was required because of Trahan’s job related injuries. As such, the amount due for the MRI is owed by defendants.
ASSIGNMENT OF ERROR 7:
Trahan asserts it was error not to award him an additional $267.00 in back compensation for the initial week of injury. We disagree.
Louisiana Revised Statute 23:1224 provides:
“No compensation shall be paid for the first week after the injury is received; provided, that in cases where disability from injury continues for six weeks or longer after date of the accident, compensation for the first week shall be paid after the first six seeks have elapsed.”
Trahan was injured on February 8, 1989. He received uninterrupted compensation benefits for a period of approximately eight (8) months. His first check was dated February 27, 1989 in the amount of $534.00. Each bi-weekly check thereafter was in the amount of $534.00 representing the maximum weekly rate of $267.00. His last check was dated October 10, 1990 and represented payment through October 24, 1990, six days after trial. A total of eighty-eight weeks elapsed from February 8, 1989 to October 24, 1990. Trahan’s average weekly wage was $291.68. Sixty-six and two-thirds of this amount would entitle Trahan to a corresponding weekly compensation rate of $194.45. This figure multiplied by 88 weeks equals $17,111.60, the total compensation due Trahan. Trahan actually received $23,496.00. Thus, we find no reason to award any additional compensation.
This assignment of error is without merit.
For the reasons assigned, the judgment of the trial court is reversed in part and defendants are ordered to pay all medical expenses, including diagnostic tests and prescription medications, associated with Trahan’s treatment by Dr. LaRocca prior to the trial of this matter. Defendants are also ordered to pay' the New Orleans Radiology Group for the MRI performed March 14, 1989. In all other respects, the trial court judgment is affirmed.
REVERSED IN PART; AFFIRMED IN PART.

. Dr. Seltzer testified via sworn deposition of October 20, 1990.

. Dr. LaRocca testified via sworn deposition of October 19, 1990.

. Dr. Williams testified via sworn deposition of November 12, 1990.